## AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR SEARCH WARRANTS

I, KYLA TAYLOR, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since May 2016. I completed five months of FBI Special Agent Basic Training at the FBI Academy in Quantico, Virginia. I am currently assigned to the Rockford Resident Agency of the FBI's Chicago Field Division. Prior to becoming an FBI Special Agent, I was a Staff Operations Specialist with the FBI in Springfield, Illinois. While employed by the FBI, I have investigated complex financial crimes and federal criminal violations related to wire fraud, mail fraud, visa fraud, bank fraud, identity theft, bankruptcy fraud, and conspiracy.

### Basis and Purpose of Affidavit

2.      This affidavit is made in support of an application to search the following for evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 1343 (the "**Subject Offenses**"), and more particularly described in Attachment A1, which includes the following:

a.      A single-family residence located at 561 Vonbryan Trace Lexington, Kentucky 40509 (the "**Subject Premises 1**");

b.      Any vehicles registered to and/or utilized by Mark Carroll ("M. CARROLL") and that are present at the **Subject Premises 1** at the time of the search; and

c.      Any electronic devices seized from the **Subject Premises 1**, from any vehicles, and from the person of M. CARROLL (collectively, the "**Subject Devices 1**"), to include the cellular phone that was assigned phone number (859) 230-6191 between October 2019 and

1

present that was used by M. CARROLL[1], with service provided by T-Mobile (the "**Subject Phone 1**").

3.     This affidavit is also made in support of an application to search the following for evidence, fruits and instrumentalities of violations of the **Subject Offenses** and more particularly described in Attachment A2, which includes the following:

a.     A single-family residence located at 828 Bethel Lane Bowling Green, Kentucky 42103 (the "**Subject Premises 2**");

b.     Any vehicles registered to and/or utilized by Luke Curry ("CURRY") and that are present at the **Subject Premises 2** at the time of the search; and

c.     Any electronic devices seized from the **Subject Premises 2**, from any vehicles, and from the person of CURRY (collectively, the "**Subject Devices 2**"), to include the cellular phone that was assigned phone number 270-791-2499 between August 2021 and present that was used by CURRY[2], with service provided by AT&T, and the cellular phone that was assigned phone number 270-709-7922 between October 2019 and present that was used by and subscribed to CURRY, with service provided by Verizon (the "**Subject Phones 2**").

---

[1] Subscriber records provided by T-Mobile list the mobile station international subscriber directory number name for 859-230-6191 as M. CARROLL. The billing details for 859-230-6191 list the bill name as Derek McGinnis with a birth date and social security number that do not match Derek McGinnis's information but instead match M. CARROLL's information. Furthermore, according to open-source information, Derek McGinnis is associated with Uplifters of Niceville Inc. Florida Secretary of State ("SOS") Articles of Incorporation records list M. CARROLL as a member of Uplifters of Niceville Inc.

[2] Subscriber records provided by AT&T list subscriber as "PREPAID CUSTOMER". The "contact home email" account associated with 270-791-2499 is "phil41300@protonmail.com". In September 2022, subscriber records were obtained for CURRY's Coinbase account. The name, social security number, date of birth, driver's license number and address on the Coinbase account were CURRY's. Additionally, the email address provided was "phil41300@protonmail.com" and the phone number provided was 270-791-2499.

2

4.      The statements contained in this affidavit are based in part on information provided by federal law enforcement agents, written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, including other law enforcement agencies, information gathered from investigative sources of information, and my experience, training and background as a Special Agent. Because this affidavit is being submitted for the limited purpose of securing search warrants, I have not included each and every fact known to me concerning this investigation.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of the **Subject Offenses** have been committed and are being committed and/or will be committed by M. CARROLL and CURRY (collectively, the "**Subjects**"). Furthermore, I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, fruits and instrumentalities of the **Subject Offenses** are presently located at the **Subject Premises 1** and **Subject Premises 2**, in a vehicle on **Subject Premises 1** and **Subject Premises 2**, on M. CARROLL's and CURRY's person, and in the **Subject Devices 1** utilized by M. CARROLL and the **Subject Devices 2** utilized by CURRY, as further described in Attachments A1 and A2.

## PROBABLE CAUSE

### Background Information Regarding the Investigation

**A.  Summary of Initial Investigation**

6.      In summary, and as described further below, the FBI is investigating a financial fraud scheme being conducted by the **Subjects**. Generally, that financial fraud scheme has taken two forms: (1) an 80/20 line of credit fraud scheme, and (2) private loan agreements fraud scheme.[3]

---

[3] For the purposes of this affidavit, this type of 80/20 line of credit will also be referred to as an 80/20 loan.

Additional individuals identified as participating in the financial fraud scheme are Brock Carroll ("B. CARROLL"), Leslie Wright ("WRIGHT"), Tommy Lockhart ("LOCKHART"), Michael Fiore ("FIORE"), Landon Morgan ("MORGAN") and others yet to be identified at this time. M. CARROLL and CURRY have primarily used the entities called Catapult Funding LLC ("CATAPULT FUNDING") and Catapult Marketing, LLC[4] ("CATAPULT MARKETING") to perpetuate their financial fraud scheme. However, they have also used other entities. CATAPULT FUNDING and CATAPULT MARKETING (collectively, "CATAPULT") were used interchangeably by the **Subjects** in perpetuating the fraud scheme.

7.      On May 2, 2023, a grand jury in the Northern District of Illinois, Western Division, returned a six-count indictment (currently under seal) against M. CARROLL and CURRY for wire fraud, in violation of Title 18, United States Code, Section 1343, and warrants for their arrests were issued (currently under seal).

8.      On or about May 6, 2020, CATAPULT signed a line of credit agreement and terms with VICTIM COMPANY 1[5] for CATAPULT to provide a line of credit to VICTIM COMPANY 1 in the amount of $2,500,000 in exchange for an initial $500,000 deposit made by VICTIM COMPANY 1. On or about May 6, 2020, per CATAPULT's instructions, VICTIM COMPANY 1 wired[6] $500,000 from its bank in Byron, Illinois to Individual 2's IOLTA[7] account believed,

---

[4] "LLC" is an acronym for limited liability company.

[5] At all times relevant to the activity described in this affidavit, VICTIM COMPANY 1 was an Illinois general partnership, or "common law entity", operating in Poplar Grove, Illinois.

[6] A wire transfer is an electronic transfer of funds across a network administered by hundreds of banks around the world. A wire contains identifying information for the parties involved including, but not limited to, participating banks, the participants' bank accounts, participants' addresses, and notes participants can include regarding the purpose or other characteristics of the transfer of funds.

[7] An interest on lawyers trust account ("IOLTA") is a type of account typically used by attorneys as a method of raising money for charitable purposes and storing large amounts of cash for fiduciary purposes.

based on my training and experience and the evidence in this case, to be located outside of Illinois. As described in greater detail below, there is probable cause to believe that the individuals operating CATAPULT did not fund the line of credit to VICTIM COMPANY 1, nor did they return VICTIM COMPANY 1's initial deposit money.

9.      As further detailed below, emails from employees of VICTIM COMPANY 1 and GoDaddy records were obtained, which identify roles for individuals associated with CATAPULT. Based on the GoDaddy records, the following positions were held at CATAPULT as of January 7, 2020: WRIGHT as the Chief Operating Officer (COO); M. CARROLL as the CEO; and CURRY as the President. Additionally, the GoDaddy records revealed B. CARROLL as having an email address of crd@catapult.llc.

10.     On or about November 9, 2021, a federal search warrant was issued by Magistrate Judge Lisa A. Jensen in the Northern District of Illinois, Western Division, to allow the government to search the following Microsoft email accounts: coo@catapult.llc, crd@catapult.llc[8], jason@dsaci.com, luke@dsaci.com, ceo@catapult.llc, president@catapult.llc, and cmo@dsaci.com.

11.     During the investigation, at least four other companies have reported to investigating agents to be victims of the financial fraud scheme perpetrated by CATAPULT. The investigation has revealed that CATAPULT, including their associated individuals and entities, are furthering the financial fraud scheme by conducting a Ponzi[9] scheme.

---

[8] A review of emails received pursuant to the search warrant served on Microsoft identified B. CARROLL's title with CATAPULT was the Client Relations Director.

[9] In general, a Ponzi scheme is a type of investment fraud that pays returns to existing investors by collecting money from new investors. Such payouts give the impression that the investments are legitimate, when in reality it is the investors who are the source of the payouts and not successful investments and a legitimate

**B.  Summary of Entities and Associated Bank Accounts**

12.     As further described below, the **Subjects** owned and operated multiple entities and created bank accounts for themselves and those entities. Some of the **Subjects**' entities, their associates' entities, and related bank accounts, as well as other individuals involved in the fraud scheme are as follows:

a.     CATAPULT MARKETING was registered with the Kentucky SOS on or about November 23, 2018. Kentucky SOS Articles of Organization records listed M. CARROLL and CURRY as the organizers. CATAPULT MARKETING opened an account at JPMorgan Chase Bank ending in x3237 ("CATAPULT account x3237") on or about October 18, 2019, which listed M. CARROLL and CURRY as authorized signers[10].

b.     CATAPULT FUNDING was registered with the Wyoming SOS on or about October 12, 2019. Wyoming SOS Articles of Organization records listed CURRY as the organizer and Chief Executive Officer. On or about October 18, 2019, CATAPULT FUNDING opened an account at JPMorgan Chase Bank ending in x5688 ("CATAPULT account x5688"), which listed M. CARROLL and CURRY as authorized signers. JPMorgan Chase Bank did not provide any documentation to indicate that additional authorized signers were added to the account during the period analyzed. Therefore, investigating agents believe that M. CARROLL and CURRY were the only individuals capable of initiating wire transfers from account CATAPULT x5688.

---

money-making enterprise. Often times subjects perpetrating Ponzi schemes will guarantee investors a high rate of return with little risk involved.

[10] A bank generates a document called a signature card which identifies all the individuals listed as authorized signers on that account.

c.      Catapult Enterprise LLC was registered with the Wyoming SOS on or about February 9, 2021[11].

d.      The Carroll Foundation Inc.[12] was a nonprofit corporation that was registered with the Kentucky SOS on or about April 25, 2019. Kentucky SOS Articles of Incorporation records listed M. CARROLL as the registered agent. The Carroll Foundation Inc. records stated the purpose of the entity was to "provide after school programs." The Carroll Foundation Inc. opened an account at JPMorgan Chase Bank ending in x6722 ("Carroll Foundation account x6722") on or about May 17, 2019, which listed M. CARROLL as an authorized signer.

e.      Dynamic Solutions and Consulting Inc.[13] ("DSACI") was a nonprofit corporation that was registered with the Kentucky SOS on or about April 12, 2019 by CURRY. Kentucky SOS Articles of Incorporation records listed CURRY as the registered agent. DSACI opened an account at JPMorgan Chase Bank ending in x3895 ("DSACI account x3895") on or about October 30, 2019, which listed CURRY as an authorized signer.

---

[11] Catapult Enterprise LLC was registered by Individual 8. In an interview with the FBI on January 19, 2022, M. CARROLL stated he and CURRY have an entity called Catapult Enterprise LLC, which they used to get involved in commission-based deals, including PPE.

[12] A search for The Carroll Foundation Inc. was conducted using the Internal Revenue Service's (IRS) Tax Exempt Organization public database with no results.

[13] CURRY listed the purpose of DSACI was "to help people in need in small business". A review of GoDaddy Inc. records identified WRIGHT as the CMO and CURRY and WRIGHT having email accounts associated with the company. A review of JPMorgan Chase Bank account opening documents for DSACI account x3895 listed CURRY as the president. A search for DSACI was conducted using the IRS Tax Exempt Organization public database with no results. In an interview with the FBI on January 19, 2022, CURRY stated he set up DSACI and it was basically a tax shelter. Based on my training, experience and conversations with other law enforcement agents, I understand "tax shelter" to refer to ways individuals or corporations reduce their tax liability.

7

f.      Mash Boys LLC was registered with the Kentucky SOS on or about June 13, 2019. Kentucky SOS Articles of Organization records listed CURRY as an organizer. An additional Kentucky SOS record listed CURRY as the registered agent and M. CARROLL as an officer or chairman of the board.

g.      Still Oaks Farm LLC[14] was registered with the Wyoming SOS on or about September 14, 2020. Still Oaks Farm LLC opened an account at JPMorgan Chase Bank ending in x9223 ("Still Oaks Farm account x9223") on or about October 8, 2020, which listed CURRY as an authorized signer. On or about January 28, 2021, WRIGHT was added as an authorized signer on account Still Oaks Farm x9223.

h.      Brainstorm LLC[15] was registered with the Kentucky SOS on or about May 26, 2020. The Kentucky SOS Annual Report listed LOCKHART and others as managers of Brainstorm LLC.

i.      On or about October 24, 2019, an individual known to law enforcement to be CURRY's wife, opened an account at JPMorgan Chase Bank ending in x3195 ("CURRY account x3195"). [16] On or about October 29, 2019, CURRY was added as an authorized signer.

j.      In August 2018, Individual 2 opened an account at KeyBank ending in x8951 ("IOLTA account"), which was titled "Attorney Escrow/IOLTA". From August 2018 to approximately March 2020, IOLTA account had minimum activity in it. When the account was

---

[14] Still Oaks Farm LLC was registered by Individual 8. In an interview with the FBI on January 19, 2022, CURRY stated his farm had an LLC called Still Oaks.

[15] In an interview with the FBI on or about December 22, 2021, LOCKHART stated he and FIORE started Brainstorm on May 26, 2020.

[16] Based on my training and experience and evidence in this case, I believe this individual to be CURRY's wife and that they are currently still together because, including but not limited to, review of social media, open source information, and database checks.

created, the signature card for IOLTA account listed only Individual 2 as an authorized signer. KeyBank did not provide any documentation to indicate that additional authorized signers were added to the account during the period analyzed. Therefore, investigating agents believe that Individual 2 was the only individual capable of initiating wire transfers from IOLTA account for the time period discussed in this affidavit.

        k.    At an unknown date, but by at least September 16, 2017, CURRY maintained an account at US Bank ending in x6162 ("account x6162") in CURRY and his wife's name.[17]

**Facts Supporting Probable Cause to Search the Subject Premises and the Subject Devices**

**A. 80/20 Line of Credit Fraud Scheme**

13.    The investigation has revealed a financial fraud scheme perpetuated by CATAPULT that involves multiple victim companies. For each victim company that has been interviewed by the FBI, CATAPULT offered to fund about 80% of a loan in exchange for an upfront deposit of or about 20% from the victim company. By CATAPULT's own terms, the victim companies' deposits were to be held in an account until the conclusion of their loans. At the conclusion of the loans, the victim companies' deposits would be returned to them as their last loan payment.

**1) VICTIM COMPANY 1**

14.    In early 2020, according to Individual 1, an employee of VICTIM COMPANY 1, Individual 1 was introduced to Individual 3 through a mutual friend. At the time, VICTIM COMPANY 1 was looking for a loan to expand their farming operations. Individual 3 told

---

[17] US Bank was unable to locate the opening document or signature card for account x6162.

Individual 1 he had previously received funding from CATAPULT and ultimately put VICTIM COMPANY 1 in contact with CATAPULT. Individual 1 recalled participating in approximately one dozen conference calls discussing the terms of the loan with individuals that Individual 1 believed, based on representations, were from CATAPULT. Those individuals included CURRY, WRIGHT, M. CARROLL, B. CARROLL, and Individual 3.

15.     On or about April 22, 2020, WRIGHT sent an email to VICTIM COMPANY 1 with a document attached that stated, in part, that Individual 2's IOLTA bank account was "a family office approved fiduciary for Catapult Funding. The deposit has to be placed with an approved fiduciary as part of the funding process." On or about April 22, 2020, WRIGHT sent an email to VICTIM COMPANY 1 with a document attached that was titled "Deposit Agreement-Catapult-[VICTIM COMPANY 1].pdf". The attached document was not dated or signed but stated, in part, that the "client shall send funds by bank wire to the appointed Attorney Trust Account on behalf of [VICTIM COMPANY 1], held by [Individual 2's] IOLTA in the amount of [blank space] to be held in safe keeping by [Individual 2's] IOLTA."[18]

16.     On or about May 6, 2020, CURRY, as the president of CATAPULT, signed the "Line of Credit Agreement and Terms" with VICTIM COMPANY 1. That document was also signed by Individual 10, manager/partner of VICTIM COMPANY 1, on behalf of VICTIM COMPANY 1. The terms stated that CATAPULT would extend a line of credit to VICTIM COMPANY 1 after VICTIM COMPANY 1 made an initial deposit of $500,000 with CATAPULT. According to the draw schedule included in the line of credit agreement, VICTIM COMPANY 1 was to receive the first payment of $500,000 from CATAPULT on or about July 15, 2020.

---

[18] VICTIM COMPANY 1 did not provide investigating agents with a copy of the attached document and it is unknown if a signed version of the document was created.

17.     On or about May 5, 2020, again on behalf of VICTIM COMPANY 1, Individual 10 signed a document titled "Term Sheet – Loan Facility." On or about May 6, 2020, that document was also signed by CURRY, as the managing member of CATAPULT. That term sheet laid out the background, terms, and conditions of the 80/20 loan to be provided to VICTIM COMPANY 1 by CATAPULT. In summary, the term sheet detailed that VICTIM COMPANY 1 would provide 20% of the loan amount as a deposit and then CATAPULT would fund 80% of the loan amount. The "Closing" section of this document stated, in part, the following: "A Fiduciary will be assigned by Lender to ensure the safekeeping of the Borrowers deposit."; "The Borrowers twenty percent (20%) initial deposit, will remain on deposit with the Fiduciary for a maximum of 12 months or until Credit Facility is fully funded."; "The Borrowers twenty percent (20%) deposit, will then be deployed to the project as the final twenty percent (20%) as per the draw down schedule submitted by the Borrower and approved by the Lender or returned to account it was drawn from initially."

18.     On or about May 6, 2020, and in accordance with CATAPULT's instructions, VICTIM COMPANY 1 sent an email to Byron Bank in Bryon, Illinois requesting a wire transfer of $500,000 from VICTIM COMPANY 1's bank account with Bryon Bank to Individual 2's IOLTA account, and believed, based on my training and experience and evidence in this case, to be located outside of Illinois. The wire transfer of $500,000 was completed and the money was transferred into Individual 2's IOLTA account. As described in greater detail below, there is probable cause to believe that the individuals operating CATAPULT did not fund the line of credit to VICTIM COMPANY 1, nor did they return VICTIM COMPANY 1's initial deposit money.

19.     From approximately November 2020 through February 2021, email and phone communications continued between individuals at VICTIM COMPANY 1 and individuals associated with CATAPULT regarding the return of VICTIM COMPANY 1's deposit money.  On

or about January 29, 2021, an attorney for VICTIM COMPANY 1 emailed Individual 2 requesting immediate confirmation that Individual 2 still held VICTIM COMPANY 1's $500,000 and demanded that Individual 2 return the funds to VICTIM COMPANY 1. On or about February 1, 2021, Individual 2 replied to VICTIM COMPANY 1's attorney via email and stated, in part, "I have never been a fiduciary for your client's funds. I received them on behalf of my client, Catapult Funding, and transferred them pursuant to Catapult's instructions. I have asked Catapult for copies of its agreements with [VICTIM COMPANY 1] and have received the attached. I am informed that the fiduciary identified in those documents still has your client's funds, and that Catapult has made a request for their return." The documents attached to Individual 2's email reply were the "Term Sheet – Loan Facility" and the "Line of Credit Agreement and Terms". The "Term Sheet – Loan Facility" document states "a Fiduciary" in the document but, does not name a specific individual. On or about April 1, 2020, April 22, 2020, and again on May 5, 2020, VICTIM COMPANY 1 was provided documents by CATAPULT that named Individual 2 as the fiduciary and detailed Individual 2's IOLTA account for the deposit to be made into.

20.     On or about May 19, 2021, in reply to an email from VICTIM COMPANY 1's attorney requesting an accounting of VICTIM COMPANY 1's deposit money, Individual 2 stated, in part, "I am not the 'Fiduciary' identified in agreements directly between Catapult Funding and VICTIM COMPANY 1. I would not have accepted such a role and did not do so. My understanding of the deposit into my trust was that it was a payment to Catapult by VICTIM COMPANY 1 for Catapult's use. Based on that understanding, I believe my sole duty was to disburse Catapult's funds as my client instructed."

21.     A review of records for IOLTA account identified the account balance on or about May 5, 2020 was approximately $384,178. On or about May 6, 2020, VICTIM COMPANY 1's

$500,000 was deposited into IOLTA account, bringing the account balance to approximately $884,178. On or about May 8, 2020, IOLTA account paid account fees and wired money to Individual 4 and an entity associated with Individual 4, bringing the balance in the account to approximately $654,118. On or about May 14, 2020, a wire transfer of $500,000 was paid from IOLTA account to VICTIM COMPANY 2, bringing the balance in the account to approximately $154,118. VICTIM COMPANY 1's money was comingled in IOLTA account with other victims' money. Based on a review of IOLTA account activity, investigating agents believe that approximately one week after VICTIM COMPANY 1 deposited $500,000 into IOLTA account, a portion of VICTIM COMPANY 1's money was used by CATAPULT to pay back VICTIM COMPANY 2.

22.    As of the date of this filing, VICTIM COMPANY 1 has not received a single distribution from CATAPULT to fund the line of credit and CATAPULT has not refunded any of VICTIM COMPANY 1's $500,000 deposit. Furthermore, as of the date of this filing, VICTIM COMPANY 1 has also not received any money related to their line of credit with CATAPULT from any other individuals or entities associated with M. CARROLL or CURRY.

### 2) VICTIM COMPANY 2

23.    Investigating agents have interviewed other victims who have reported the **Subjects**, WRIGHT, and B. CARROLL as participants in a similar 80/20 line of credit fraud scheme. In March 2020, VICTIM COMPANY 2[19] contracted a loan with CATAPULT. According to an individual associated with VICTIM COMPANY 2, VICTIM COMPANY 2 was to deposit $500,000 with CATAPULT in exchange for a $2,000,000 loan. On or about March 17, 2020,

---

[19] At all times relevant to the activity described in this affidavit, VICTIM COMPANY 2 was a Texas LLC, operating in Austin, Texas.

VICTIM COMPANY 2 wired $500,000 from their bank to IOLTA account[20]. Approximately two months later, VICTIM COMPANY 2 requested a payment of $500,000 from CATAPULT. On or about May 14, 2020, VICTIM COMPANY 2 received a wire payment of $500,000 from IOLTA account, pursuant to the contract. At a later date and pursuant to the contract, VICTIM COMPANY 2 requested another payment from CATAPULT, but never received it. CATAPULT did not provide any additional money to VICTIM COMPANY 2.

24.     A review of records for IOLTA account identified the account balance on or about March 16, 2020 was approximately $75. On or about March 17, 2020, VICTIM COMPANY 2's $500,000 was deposited into IOLTA account bringing, the account balance to approximately $500,075. From March 17, 2020 through March 31, 2020, there are nominal fee and interest payments in and out of the account, a payment for $2,500 to Individual 2, a payment of $100,000 to a suspected victim, and receipt of $100,000 from a suspected victim. Following these transactions, the balance in IOLTA account was approximately $497,505. On or about April 13, 2020, $425,000 was wired from IOLTA account to a school district Individual 4 works for, bringing the balance in the account to approximately $72,505. VICTIM COMPANY 2's money was comingled in IOLTA account with suspected victims/other victims' money.  Based on a review of IOLTA account activity, investigating agents believe that within one month of VICTIM

---

[20] Individual 2's IOLTA account was associated with two addresses during the period analyzed. One address was in Utah and the other address was in Idaho. During an interview with the FBI, an employee of VICTIM COMPANY 3 stated that at some point during their interactions with CATAPULT, they contacted the Utah bank to inquire about IOLTA account's legitimacy. According to the interviewee, IOLTA account had been opened at a branch in Utah but was later moved to a branch in Idaho. Investigators are uncertain where Individual 2 was physically located at the time of each wire but have referred to IOLTA account as being in Utah throughout this affidavit.

COMPANY 2 depositing $500,000 into IOLTA account, a majority of VICTIM COMPANY 2's money was used by CATAPULT to pay another suspected victim and make a donation to a school.

25.     As of the date of this filing, neither CATAPULT nor any other entity or individual associated with M. CARROLL or CURRY provided any additional money to VICTIM COMPANY 2 beyond the $500,000.

### 3)  VICTIM COMPANY 3

26.     In June 2020, VICTIM COMPANY 3[21] contracted an 80/20 loan with CATAPULT. VICTIM COMPANY 3 was to deposit $150,000 with CATAPULT to receive a $750,000 loan. On or about June 4, 2020, VICTIM COMPANY 3 wired $150,000 from their bank in California to IOLTA account located in Utah. CATAPULT did not fund the loan to VICTIM COMPANY 3. VICTIM COMPANY 3 hired an attorney and demanded their deposit be returned. On or about September 28, 2020, VICTIM COMPANY 3 received $150,000 back through CATAPULT account x5688.

27.     A review of records for IOLTA account identified the account balance on or about June 4, 2020 was approximately $35,983. On or about June 5, 2020, VICTIM COMPANY 3's $150,000 was deposited into IOLTA account, bringing the account balance to approximately $185,983. VICTIM COMPANY 3's money was comingled in IOLTA account with other victims' money. Based on a review of IOLTA account activity, investigating agents believe that a portion of VICTIM COMPANY 3's money was used by CATAPULT to pay for certain expenses, believed to be at least in part personal expenses, such as travel by private jets operated by Triton, LLC.

### 4)  VICTIM COMPANY 4

---

[21] At all times relevant to the activity described in this affidavit, VICTIM COMPANY 3 was a California Corporation, operating in Temecula, California.

28.     In October 2020, VICTIM COMPANY 4[22] contracted an 80/20 loan with CATAPULT. On or about October 5, 2020, VICTIM COMPANY 4 wired $70,000 from their bank in Iowa to IOLTA account located in Utah. As of the date of this filing, VICTIM COMPANY 4 has not received a single distribution from CATAPULT to fund the line of credit and CATAPULT has not refunded any of VICTIM COMPANY 4's $70,000 deposit.

29.     A review of records for IOLTA account identified the account balance on or about October 4, 2020 was approximately $58,309. On or about October 5, 2020, VICTIM COMPANY 4's $70,000 was deposited into IOLTA account, bringing the account balance to approximately $128,309. VICTIM COMPANY 4's money was comingled in IOLTA account with other victims' money. Based on a review of IOLTA account activity, investigating agents believe that a portion of VICTIM COMPANY 4's money was wired to CATAPULT account x5688.

30.     On or about October 6, 2020, IOLTA account transferred $110,000 to CATAPULT account x5688. The money received by CATAPULT account x5688 was then transferred to the **Subjects**' other bank accounts. The DSACI account x3895 and the Carroll Foundation account x6722 received $55,000 each, which was further disbursed to additional accounts controlled by M. CARROLL and CURRY. A portion of the funds were sent to suspected victims and other participants of the scheme. Funds were also traced to purchases at Taco Bell, Little Caesars, Amazon Marketplace, Target, Wal-Mart, Marshalls, Home Goods, Enterprise rental vehicles, gas stations, and a swimming pool and hot tub service.

### 5)  VICTIM COMPANY 5

---

[22] At all times relevant to the activity described in this affidavit, VICTIM COMPANY 4 was an Iowa LLC operating in Waterloo, Iowa.

16

31.     In October 2020, VICTIM COMPANY 5[23] contracted an 80/20 loan with CATAPULT. VICTIM COMPANY 5 was to deposit $270,000 with CATAPULT to receive a $1,350,000 loan. From October 14, 2020 through October 21, 2020, VICTIM COMPANY 5 sent emails to WRIGHT asking numerous questions and expressing their concerns about the deposit leaving the fiduciary account or VICTIM COMPANY 5 never receiving funding as contracted. WRIGHT replied via email multiple times telling VICTIM COMPANY 5, in part, "Your deposit is safe in an account and can be returned anytime you ask to end your funding.", "There is no hold up or any issues. This process is completed a lot.", and "I am confirming there is no risk."

32.     On or about October 22, 2020, VICTIM COMPANY 5 wired $270,000 from their bank in Texas to IOLTA account located in Utah. CATAPULT did not fund the loan to VICTIM COMPANY 5. VICTIM COMPANY 5 demanded their deposit be returned. On or about May 14, 2021, CATAPULT wrote a check, signed by WRIGHT, to VICTIM COMPANY 5 from CATAPULT account x5688 for $20,000. As of the date of this filing, VICTIM COMPANY 5 has not received any additional money from CATAPULT.

33.     A review of records for IOLTA account identified the account balance on or about October 21, 2020 was approximately $2,659. On or about October 22, 2020, VICTIM COMPANY 5's $270,000 was deposited into IOLTA account, bringing the account balance to approximately $272,659. The same day, on or about October 22, 2020, IOLTA account wired $164,900 to Company 2[24] and $50,000 to CATAPULT account x5688. These transactions brought the balance in IOLTA account to approximately $57,759.  VICTIM COMPANY 5's money was comingled in

---

[23] At all times relevant to the activity described in this affidavit, VICTIM COMPANY 5 was a Texas LLC, operating in Port Neches, Texas.

[24] Company 2 was identified by investigating agents as a luxury home builder in Lexington, Kentucky.

IOLTA account with other victims' money. Based on a review of IOLTA account activity, investigating agents believe that a majority of VICTIM COMPANY 5's money was used to pay for the building of a personal residence, travel by private jet, and wired to CATAPULT account x5688.

34.     On or about October 22, 2020, after receiving the $50,000 transfer from the IOLTA account, the balance in CATAPULT account x5688 was approximately $423,564. The balance in CATAPULT account x5688 was comprised of the IOLTA account transfer and other victims' funds. Approximately $250,000 was transferred from CATAPULT account x5688 to Still Oaks Farm account x9223. These funds were traced to purchases for a home security system, cattle, and furniture at a home décor store.

35.     In summary, each of the above detailed victim companies stated they would not have done their deals with CATAPULT if they had known their money would be used to pay other clients or investors, to purchase personal properties, make donations, or to fund the **Subjects'** personal expenses. None of the victim companies were told their money would be used by the **Subjects** for any purpose other than to stay in IOLTA account as a deposit until the final payment of their loan was funded, at which time, their deposit money would be returned to them. These individuals appear to be victims of a Ponzi scheme being perpetrated by CATAPULT and their associated entities.

### B.  Private Loan Agreements Fraud Scheme

36.     In addition to the aforementioned victim companies of the 80/20 line of credit fraud scheme, CATAPULT also perpetuated a private loan agreements fraud scheme. Investigating agents have interviewed individuals who reported financial losses due to what they believed were loans/investments with M. CARROLL, CURRY, their entities, and/or individuals/entities

18

associated with them. These individuals also appear to be victims of a Ponzi scheme being perpetrated by M. CARROLL, CURRY, their entities, and/or individuals/entities associated with them.

### 1) VICTIM 6

37.    VICTIM 6 reported to investigating agents a failed investment involving M. CARROLL and CATAPULT. In approximately January 2020, VICTIM 6 was on a phone call with M. CARROLL during which M. CARROLL explained that CATAPULT invested in cryptocurrency, Bitcoin, and forex[25]. After speaking with M. CARROLL, VICTIM 6 decided to invest with CATAPULT. However, when VICTIM 6 received the paperwork to sign for his/her investment, it was written as a "private loan agreement" instead of an investment agreement. M. CARROLL explained to VICTIM 6 that they were going to call his/her investment a loan instead of an investment for tax reasons. From January 2020 through January 2021, VICTIM 6 entered into three different private loan agreements with CATAPULT.

38.    The first private loan agreement, signed on or about January 16, 2020, specified that the terms of the loan would be five months. The second and third private loan agreements, signed July 1, 2020 and January 21, 2021, respectively, specified that the terms of the loans would be six months. Each of the private loan agreements stated that VICTIM 6's money would be used "as working capital for investments including but not limited to forex trading, crypto currency trading/investing and other projects, when necessary, in order to guarantee the principal and interest of the loan are paid in full at the end of the term." VICTIM 6 understood that at the end of

---

[25] The foreign exchange market, also known as forex or the FX market, is a global marketplace where currencies are traded. Unlike other financial markets, there is no centralized marketplace for forex. Trading forex involves buying one currency and simultaneously selling another.

each of the investment periods, he/she could either take his/her money out or reinvest it with CATAPULT. The first private loan agreement stated VICTIM 6 expected a 17% monthly return on the loan at the end of the five-month investment period.

39.     On or about January 16, 2020, VICTIM 6 wired $84,000 from his/her bank in West Virginia into CATAPULT account x3237 located in Kentucky. In June 2020, according to how VICTIM 6 understood the terms of the agreement, VICTIM 6 could either request a pay out from his/her loan or reinvest. In an interview with the FBI, VICTIM 6 explained he/she intended to request a pay out of his/her money from CATAPULT, but after speaking to M. CARROLL and seeing "how good the numbers looked", VICTIM 6 changed his/her mind and decided to reinvest with CATAPULT for another 6 months. In addition to reinvesting his/her initial $84,000 plus interest, VICTIM 6 decided to add an additional $109,600 into his/her investment with CATAPULT. VICTIM 6 signed the second private loan agreement and then wrote a check for an additional $109,600, which was deposited into CATAPULT account x5688 on or about July 7, 2020.

40.     In approximately December 2020, VICTIM 6 requested to withdraw approximately $135,000 from his/her investment with CATAPULT and to reinvest the remaining approximately $400,000. In January 2021, VICTIM 6 signed a third private loan agreement with CATAPULT. After not receiving any money from CATAPULT, VICTIM 6 decided to hire an attorney. On or about February 8, 2021, VICTIM 6 received $35,000 from IOLTA account on behalf of CATAPULT. On or about June 2, 2021, approximately six months after VICTIM 6 requested his/her funds be returned, VICTIM 6 received a cashier's check for $182,500 paid from CATAPULT account x5688 with a check memo description "[VICTIM 6] 12/31/20 Withdrawal."

20

41.     A review of records for CATAPULT account x5688 identified the beginning account balance on or about June 1, 2021 was approximately $16,003. On or about June 1, 2021, Victim 10[26] wired $200,000 to CATAPULT account x5688. Also on or about June 1, 2021, money from CATAPULT account x5688 was used for several nominal purchases and a transfer of $15,000 to DSACI, an entity associated with CURRY. On or about June 2, 2021, CATAPULT account x5688 paid $182,500 via check to VICTIM 6, bringing the account balance to approximately $16,930. Based on the beginning monthly balance of CATAPULT account x5688, the timing of the deposit from Victim 10, and the timing of the payment to VICTIM 6, investigating agents believe that the money from Victim 10 was used to pay VICTIM 6.

42.     In an interview with the FBI, VICTIM 6 stated that he/she believed that his/her money would be used by CATAPULT only as specified in their private loan agreements. VICTIM 6 would not have authorized his/her money to be used for M. CARROLL or CURRY's personal expenses, the building of personal properties, donations of any kind, or the payment of other lenders' or investors' debts. If M. CARROLL had told VICTIM 6 his/her money would be used for any purpose outside the terms listed in the private loan agreements, VICTIM 6 would not have signed the private loan agreements.

### 2)  VICTIM 7

43.     In late 2019 or early 2020, according to VICTIM 7, CURRY told VICTIM 7 about a forex investment opportunity through CATAPULT and the returns CURRY was getting back on the investments. VICTIM 7 further stated that CURRY told VICTIM 7 that no matter what, the

---

[26] Victim 10, who is not further detailed in this affidavit, provided information that they wired $100,000 and then $200,000 to invest with Catapult. M. CARROLL told Victim 10 their money would be held in a secure account and used as collateral to invest in bourbon. As of the date of this filing, Victim 10 has not received any money back from Catapult.

21

investment opportunity was a "win-win" and that there was "no way" they could lose money. CURRY told VICTIM 7 he/she was investing in forex. CURRY told VICTIM 7 that his/her money would start in a "trading account" as part of a "big pool of money" and that CURRY had access to algorithms or people who made sure the money had a 100% growth rate. VICTIM 7 believed CURRY invested clients' money into "some system" that guaranteed the returns.

44.    On or about May 6, 2020, VICTIM 7 signed a private loan agreement with CATAPULT. VICTIM 7's private loan agreement contained essentially the same language as VICTIM 6's private loan agreement, which specified VICTIM 7's money would be used as "working capital for investments including but not limited to forex trading, crypto currency trading/investing or other projects...". The private loan agreement further stated that at the end of the six-month term, CATAPULT would pay VICTIM 7 his/her $50,000 back plus 102% interest for a total of $101,000. The 102% rate of return was guaranteed numerous times to VICTIM 7 by CURRY and WRIGHT through statements such as "nothing could go wrong" and that it was a "sure fire deal".

45.    On or about May 6, 2020, from his/her bank account located in Kentucky, VICTIM 7 paid CATAPULT FUNDING $50,000 which was deposited into CATAPULT's bank also located in Kentucky. In his/her interview with the FBI, VICTIM 7 stated that after the first investment, VICTIM 7 thought everything looked good, so he/she decided to add an additional $25,000 to his/her investment with CATAPULT. On or about June 25, 2020, VICTIM 7 signed an addendum to his/her private loan agreement with CATAPULT, which stated VICTIM 7 would deposit the additional $25,000 and then principal interest would be paid after the maturity terms of the original agreement. On or about June 25, 2020, VICTIM 7 paid CATAPULT $25,000. According to the terms of the agreement, VICTIM 7 was supposed to receive his/her first payment

from CATAPULT in December 2020, but he/she did not receive a payment. VICTIM 7's money, paid in both May and June, was comingled in CATAPULT account x5688 with other victims' money.

46.     On or about February 8, 2021, VICTIM 7 received a wire transfer of $25,000 into his/her bank account located in Kentucky from IOLTA account located in Utah. VICTIM 7 was not told that he/she would be getting a payment, nor was he/she told the source of the money he/she received. After VICTIM 7 noticed the payment in his/her bank account, VICTIM 7 contacted WRIGHT to ask about the payment, to which WRIGHT replied with "congrats", or words to that effect. VICTIM 7 asked CATAPULT numerous times for additional payments but did not receive any additional money back from CATAPULT.

47.     Additionally, according to VICTIM 7, CURRY told VICTIM 7 he had access to different pools of money, to include funding for businesses. CURRY told VICTIM 7 that if he/she knew anyone who needed funding for their business to refer them to CURRY. CURRY explained the business funding as similar to a regular bank loan, but it occurred outside the regular banking system. VICTIM 7 referred VICTIM COMPANY 3 to CURRY and CATAPULT for business funding. CURRY and WRIGHT told VICTIM 7 he/she would make a commission of approximately $1,500 for referring VICTIM COMPANY 3 to CATAPULT, but VICTIM 7 was never paid a commission.

### 3)  VICTIM 8

48.     In approximately April 2021, VICTIM 8 participated in a three-way phone call with M. CARROLL and MORGAN. According to VICTIM 8, during the call, M. CARROLL told VICTIM 8 that CATAPULT invested in many different things to make money, such as bourbon barrels, diamonds, personal protective equipment ("PPE"), and cryptocurrency. M. CARROLL

23

told VICTIM 8 that M. CARROLL was getting returns between 26% and 28%. VICTIM 8 further stated that around the time VICTIM 8 was reviewing the private loan agreement, MORGAN told VICTIM 8 that M. CARROLL gave VICTIM 8 a much higher rate of return at 50% rather than the 26% to 28% because CATAPULT did a lot of work in Miami and was planning on opening an exotic car rental business there. MORGAN told VICTIM 8, who specialized in performance cars, that CATAPULT would need someone to conduct maintenance on the vehicles there, which piqued VICTIM 8's interest.

49.     On or about April 27, 2021, VICTIM 8 signed a private loan agreement with CATAPULT. VICTIM 8's private loan agreement contained essentially the same language as that in VICTIM 6 and VICTIM 7's private loan agreements. VICTIM 8's agreement specified that VICTIM 8's money would be used as working capital for forex trading, cryptocurrency trading/investing or other projects. The private loan agreement further stated that at the end of the six-month term, CATAPULT would pay VICTIM 8 his/her $250,000 back plus 50% interest for a total of $375,000.

50.     On or about April 29, 2021, VICTIM 8 wired $250,000 from his/her bank to CATAPULT account x5688. During an interview with the FBI, VICTIM 8 stated that he/she understood that at the end of the six-month term, in November 2021, he/she could either request a pay out from CATAPULT or reinvest his/her money. VICTIM 8 decided to reinvest with CATAPULT and roll his/her purported balance of $375,000 into a new private loan agreement for another three months. On or about December 7, 2021, VICTIM 8 signed a second private loan agreement with CATAPULT, which stated the balance that would be due to VICTIM 8 in February 2022 was $465,000.

51.     CATAPULT did not pay VICTIM 8 as scheduled in the private loan agreement. VICTIM 8 contacted MORGAN to request his/her money be returned but was without success. On or about March 8, 2022, VICTIM 8 emailed M. CARROLL because he/she could not get in touch with MORGAN. On or about March 10, 2022, M. CARROLL replied stating that they were still setting things up for VICTIM 8 to get paid. As of the date of this filing, VICTIM 8 has not received any money back or otherwise from his/her private loan agreement, including not from CATAPULT, M. CARROLL, CURRY, MORGAN, or any other individuals or entities associated with them.

52.     A review of records for CATAPULT account x5688 identified the account balance on or about April 28, 2021 was approximately $1,038. On or about April 29, 2021, VICTIM 8's $250,000 was deposited into CATAPULT account x5688, bringing the account balance to approximately $251,038. The same day, on or about April 29, 2021, CATAPULT account x5688 had nominal general purchases, a $111 purchase for at Stonecrest Golf Course, a $4,000 check to Eastern Kentucky Holdings, a $5,000 check to Oliver Consulting, a wire transfer of $107,000 to the Carroll Foundation Inc., and a $117,000 wire transfer to Still Oaks Farm LLC, the latter two entities being entities associated with M. CARROLL and CURRY, respectively. These transactions brought the balance in CATAPULT account x5688 to approximately $17,808. VICTIM 8's money was comingled in CATAPULT account x5688 with other victims' money. Based on a review of CATAPULT account x5688, investigating agents believe that a majority of VICTIM 8's money was transferred to the **Subjects**' other bank accounts.

53.     The funds received by M. CARROLL from CATAPULT account x5688 on or about April 29, 2021 were traced to payments to a contractor building M. CARROLL's personal residence, Taco Bell, TJ Maxx, Aldi, Wal-Mart, and Foster Medical Clinic. Records received from

Foster Medical Clinic revealed that the payments made using victim funds were for M. CARROLL to obtain hydration IVs, vitamin b, testosterone cypionate injections and other vitamins/injections. The funds received by CURRY from CATAPULT account x5688 on or about April 29, 2021 were traced to payments to a contractor building CURRY's personal residence, Wendy's, other restaurants, and Enterprise rental vehicles.

54.     In summary, each of the above detailed victims stated they would not have invested money with CATAPULT if they had known that their money would be used to pay other clients or investors, to purchase personal properties, make donations, or to fund the **Subjects'** personal expenses. None of the victims were told their money would be used by the **Subjects** for any purpose other than investing in Bitcoin, forex, or other investment strategies as specified in their written agreements.[27]

## C. Interviews

### 1) Mark CARROLL[28]

55.     On or about January 19, 2022, M. CARROLL was interviewed by the FBI and, in part, provided the following information: M. CARROLL was having a home built in the Lexington, Kentucky area. In addition to that, M. CARROLL and CURRY worked as consultants putting people together, similar to what a broker would do, except they were not licensed as brokers. Some of M. CARROLL and CURRY's entities included CATAPULT MARKETING,

---

[27] According to VICTIM 8, at the end of the six-month term for VICTIM 8's initial investment, VICTIM 8 had a phone conversation with M. CARROLL and understood his/her money would also be used for the purchase and distribution of sugar in South Africa.

[28] Prior to January 19, 2022, the FBI made contact with M. CARROLL and he agreed voluntarily to an interview with the FBI. M. CARROLL was interviewed by the FBI at the FBI Louisville Division, Lexington Residence Agency located in Lexington, Kentucky. M. CARROLL was not in custody during his interview and was free to end the interview and leave at any time.

CATAPULT FUNDING, and Catapult Enterprise LLC. M. CARROLL and CURRY had not done anything with CATAPULT MARKETING for a long time.

56.     M. CARROLL and CURRY had "never" invested money on behalf of other people. M. CARROLL borrowed money from people and he invested it himself. M. CARROLL never used the word "investment" with anybody. M. CARROLL and CURRY would do a loan agreement with clients and would promise a certain amount of interest, similar to a regular loan. M. CARROLL stated the interest rate would depend on whatever CATAPULT had going on. There were clear reasons why M. CARROLL and CURRY stayed away from investments. For example, M. CARROLL and CURRY were not qualified to do that or licensed to do that. M. CARROLL again stated, "We have never said to anybody that we do investments. Those words have never come out of my mouth."

57.     M. CARROLL and CURRY were introduced to Individual 5 around late 2019 and have met him/her in person. M. CARROLL stated that up until the point of meeting Individual 5, M. CARROLL and CURRY had never financed any projects using a family office. M. CARROLL and CURRY had approval letters for various clients' projects, but CATAPULT never funded the projects and no clients provided money to M. CARROLL or CURRY. M. CARROLL and CURRY had two contracts with Individual 5. The first contract was signed in April 2020 and the second contract was signed in June 2020. According to the contracts, Individual 5 was due to start paying M. CARROLL and CURRY in June and August 2020. M. CARROLL estimated Individual 5 owed M. CARROLL and CURRY $55 million as a result of their two contracts.

58.     M. CARROLL and CURRY were the only individuals with access to the CATAPULT MARKETING bank account and the CATAPULT FUNDING bank account. No one else was authorized to move money from these accounts except M. CARROLL and CURRY. M.

CARROLL estimated they owed people a total of approximately $10 million. M. CARROLL and CURRY could not pay all the people off until M. CARROLL and CURRY were paid. The contracts M. CARROLL and CURRY signed were "good and backed". M. CARROLL stated he was not holding money because he did not want to pay people and he was not "flying around the world" while they owed all those people money. M. CARROLL explained they had previously been able to pay everyone, but the past six months had been a problem and they had really run into a wall. While waiting for Individual 5 to pay them, M. CARROLL and CURRY paid clients using money from whatever they had going on. M. CARROLL and CURRY used any money they had coming into the CATAPULT bank account to pay clients off. M. CARROLL detailed numerous different deals he and CURRY had going including, but not limited to, PPE, sand hauling, gold, diamonds, and bourbon.

### 2)  Luke CURRY[29]

59.    On or about January 19, 2022, CURRY was interviewed by the FBI and, in part, provided the following information: CURRY was self-employed and made commissions off deals, consulted, and was working on PPE deals. CURRY and M. CARROLL created CATAPULT FUNDING in 2019 because they were trying to get funding for themselves to do a bourbon deal. CURRY and M. CARROLL were put in contact with Individual 9's "private family office", which was a term used to describe a family that had a lot of money. Individual 2 was the "pay master" for Individual 9's family office.

---

[29] Prior to January 19, 2022, the FBI made contact with CURRY and he agreed voluntarily to an interview with the FBI. CURRY was interviewed by the FBI at the FBI Louisville Division, Lexington Residence Agency located in Lexington, Kentucky. CURRY was not in custody during his interview and was free to end the interview and leave at any time.

60.     CURRY stated Individual 9's family office was looking to do "80/20" loans where the client would deposit 20% and then the family office would fund 80%. CURRY and M. CARROLL were told that for any clients they sent to the family office who were successfully funded, CURRY and M. CARROLL would receive a percentage-based origination fee. CURRY and M. CARROLL were pre-approved to get a $200 million loan from Individual 9's family office for their bourbon deal. However, CURRY and M. CARROLL never received any money from Individual 9's family office because they did not have the funds to make a 20% deposit.

61.     In approximately late 2019, CURRY and M. CARROLL had lined up a couple of clients who wanted to get funding through the 80/20 loans. CURRY got all the clients' paperwork together and produced it to the family office. If the family office approved the clients for 80/20 loans, the clients would deposit their 20% into Individual 2's IOLTA account. Individual 2's IOLTA bank account was a CATAPULT FUNDING account, but it was not in CATAPULT FUNDING's name. CURRY and M. CARROLL would direct Individual 2 where to send clients' money once it was in the IOLTA account.

62.     In November 2019 or early 2020, Individual 9's family office closed. CURRY stated that despite being suspicious of Individual 9's family office actually paying out, CURRY and M. CARROLL continued to take on 80/20 loan clients. In early 2020, clients began making their 20% deposits with M. CARROLL and CURRY and executed their loan paperwork with CATAPULT. CATAPULT had four or five clients do the 80/20 loans. CURRY recalled VICTIM COMPANY 1, a Texas real estate company[30], and a person from Texas as being some of the companies that did 80/20 loans with CATAPULT. These clients were expecting to get funding

---

[30] Based on interviews and a review of financials, investigating agents believe CURRY's description of the Texas real estate group to be describing VICTIM COMPANY 2.

through CURRY and M. CARROLL, but CURRY and M. CARROLL could not get funding to pay the clients and therefore the clients' projects were delayed.

63.     In early 2020, CURRY was put in contact with Individual 5. When CURRY and M. CARROLL knew funding was not coming from Individual 9's family office, they went to Individual 5. Individual 5 was going to serve as the new family office by offering a new line of funding for CURRY and M. CARROLL to use. CURRY and M. CARROLL told Individual 5 on a phone call that they had clients who wanted funding. Individual 5's funding was also based on an 80/20 loan structure. CURRY and M. CARROLL were supposed to deposit $2 million with Individual 5 to receive funding for their own 80/20 loan. However, CURRY and M. CARROLL instead told Individual 6 to pay Individual 5 $2 million on their behalf so they could get funding for a $10 million loan. M. CARROLL and CURRY then told Individual 5 not to pay them the $10 million but to reinvest it so they could get a higher line of credit funded. CURRY told Individual 5 that he and M. CARROLL did not have a business that was generating money and therefore the only way they could pay CATAPULT's clients was to take on more debt from new clients.

64.     CURRY stated the debt and issues snowballed. CURRY and M. CARROLL paid the Texas real estate group their $500,000 deposit back. CURRY stated the money used to pay the Texas real estate group back came from new clients' deposit money. CURRY did not tell clients who were receiving money from other clients' deposits where their money was coming from. Therefore, clients did not know they were getting paid money that had come from other clients. CURRY was basically shuffling money around to pay who was owed while waiting on other loans to come due and waiting on Individual 5 to pay M. CARROLL and himself.

65.     Around October 2020, CURRY realized money was not coming from Individual 5. CURRY stated, "What we started doing was, we said okay, if we can solve this with our own

30

monies, right, peer-to-peer lending, then maybe we can buy enough time for [Individual 5] to get us paid." M. CARROLL and CURRY then started taking loans from people through promissory notes. CURRY and M. CARROLL's debt increased because they were "doing loans to then pay people tranches" for the 80/20 loans. CURRY and M. CARROLL had also done the deal with Individual 5 so they could pay CATAPULT's initial group of 80/20 loan clients.

66.     As of the date of CURRY's interview with the FBI, M. CARROLL and CURRY had not received any money or commissions from Individual 5 except for one payment of approximately $5,000 via Apple pay.

67.     CURRY and M. CARROLL controlled the CATAPULT FUNDING bank account[31]. WRIGHT may have been authorized to sign checks from the account, but WRIGHT did not have authorization to withdraw money or conduct wire transfers. CURRY and M. CARROLL did not put any of their own money into CATAPULT FUNDING's bank account because they had just opened the entity to get their own line of credit funded. CATAPULT FUNDING was M. CARROLL and CURRY's business; nobody else was running it. CURRY stated, "We did the loans. We did the promissory notes. It's our business."

68.     The debt CURRY and M. CARROLL had taken on was smaller than what they believed they were owed by Individual 5 and therefore, CURRY felt all their debt was backed by contracts. CURRY stated if he had known Individual 5 was not going to pay, they would not have taken on additional debt. CURRY estimated CATAPULT's current debt owed to clients was $10 million. CURRY did not have a separate job at this time. CURRY and M. CARROLL issued themselves a line of credit from CATAPULT to pay for living expenses. For CURRY and M.

---

[31] Based on a review of financials, investigating agents believe CURRY to be referring to CATAPULT account x5688.

CARROLL's line of credit agreements, CURRY and M. CARROLL had essentially paid themselves from CATAPULT's clients' 20% deposits.

**4) Individual 5**

69.     On or about February 14, 2023, Individual 5 was interviewed by the FBI and, in part, provided the following information:  Individual 5 owned a consulting company, the purpose of which was to facilitate financing with brokers.   In approximately 2020, a mutual broker introduced Individual 5 to M. CARROLL and CURRY.

70.     M. CARROLL and CURRY operated a company called CATAPULT FUNDING. According to Individual 5, M. CARROLL and CURRY needed a facilitator for deals they were trying to close with VICTIM COMPANY 11[32] and Individual 6.  Individual 5 entered into written agreements with CATAPULT and worked with M. CARROLL and CURRY to provide funding for VICTIM COMPANY 11 and Individual 6.

71.     Individual 5 stated the financing for each deal would come from a third-party company located in Japan.  Individual 5 would facilitate leveraged loans to VICTIM COMPANY 11 and Individual 6 with the loan totals being approximately $35,000,000 and $10,000,000, respectively.  VICTIM COMPANY 11 paid a deposit of $7,000,000 to Individual 5. Individual 6 paid a deposit of $2,000,000 to Individual 5. Individual 5 sent the funds to the Japan company but ultimately did not receive funding from them and therefore did not provide funding for VICTIM COMPANY 11 of Individual 6's loans as promised, nor were the deposits returned.

72.     Individual 5 stated he/she did not receive compensation of any kind for Individual 5's role in the deal with VICTIM COMPANY 11 or Individual 6. Individual 5 further related that

---

[32] At all times relevant to the activity described in this affidavit, VICTIM COMPANY 11 was a limited liability company operating in Florida.

32

he/she did not know whether M. CARROLL or CURRY had any debt prior to entering into the deal with VICTIM COMPANY 11.  According to Individual 5, M. CARROLL and CURRY did not ask Individual 5 to take on any of their debt.

73.     Individual 5 related that he/she did not receive any money from CATAPULT. At some point, Individual 5 sent M. CARROLL and CURRY approximately $20,000 to help them with expenses related to things like their kids and food.  Individual 5 stated he/she did not owe M. CARROLL, CURRY, or CATAPULT $50,000,000, nor had Individual 5 promised anyone money outside of the aforementioned contracts with VICTIM COMPANY 11 and Individual 6.  Individual 5 has never had a successful deal with M. CARROLL or CURRY and was never paid for any deal with M. CARROLL, CURRY, or CATAPULT.

**D.  Financial Analysis**

74.     Investigators conducted a financial analysis of numerous bank accounts identified during the course of the investigation, including bank accounts that paid or received money to/from the known victims. The accounts analyzed included, but were not limited to, accounts opened and utilized by CATAPULT FUNDING, CATAPULT MARKETING, CURRY, M. CARROLL, and Individual 2.

75.     VICTIM COMPANY 1, VICTIM COMPANY 2, VICTIM COMPANY 3, VICTIM COMPANY 4, VICTIM COMPANY 5, VICTIM 6, and VICTIM 7 each wired money to or received money from IOLTA account. A review of records received for IOLTA account identified that between March 2020 and March 2021, approximately $7,760,043 flowed through the account. Approximately $6,154,925 of those funds contained a note on the wires that indicated the wires were intended for CATAPULT FUNDING. Approximately $472,500 of the funds contained a note on the wires that indicated the wires were intended for Mash Boys LLC.

Approximately $202,500 of the funds wired to IOLTA account contained a note on the wires that indicated the wires were intended for Brainstorm, LLC.

76.     Other wires totaling approximately $170,000 were deposited into IOLTA account with wire notes that included the term "investment" in some fashion. Approximately $760,118 of the remaining deposits into IOLTA account were derived from interest income, unknown deposits, or wires containing no wire note detail. Of the $7,760,043 deposited into the account, investigating agents can attribute approximately 88% of the funds deposited into the account directly to CATAPULT or its associated entities.

77.     Between March 2020 and March 2021, approximately $7,744,543 flowed out of IOLTA account. Approximately $2,828,021 was wired out of IOLTA account with a wire note that included the phrase "From Catapult Funding" or something similar. Of the wires from IOLTA account that were reviewed and contained a note stating, "from Catapult Funding" or something similar, records indicated the funds were used to pay for potential home construction or home remodeling.

78.     From on or about October 22, 2020 through January 27, 2021, Company 2, a company that investigators believe to be involved in M. CARROLL's home build, received payments totaling approximately $264,900 from IOLTA account with two of the wire notes stating "From Catapult Funding". From on or about April 20, 2020 through April 29, 2021, Company 2 also received payments totaling approximately $651,012 from Carroll Foundation account x6722 which was associated with the Carroll Foundation Inc. In M. CARROLL's interview with the FBI on or about January 19, 2022, M. CARROLL stated he was having a home built.

79.     Company 1 was identified by investigating agents as a home remodeling company. From on or about December 24, 2020 through February 5, 2021, Company 1 received

approximately $111,128 in total from IOLTA account, approximately $54,722 of which included a wire note "From Catapult Funding". A review of records from JPMorgan Chase Bank identified CURRY as an authorized signer for Still Oaks Farm account x9223, CURRY account x3195 (CURRY and his wife's personal account), and DSACI's account x3895. Payments were identified from each of these accounts to Company 1 or the owner of Company 1. The majority of the funds in accounts Still Oaks Farm account x9223, CURRY account x3195, and DSACI account x3895 had been received from CATAPULT account x5688 and are suspected to be proceeds from the scheme. From December 31, 2019 through May 13, 2021, the total CURRY paid, or directed to be paid, to Company 1 or it's owner was approximately $378,975.

80.     In an interview with the FBI on or about January 25, 2022, the owner of Company 1 stated that approximately two years ago, he/she made a deal with CURRY to complete a construction project on a property located at 880 Red Pond Road Bowling Green, Kentucky. The owner of Company 1 described the property as a barn that he/she was remodeling to update and include living quarters. The construction stopped in approximately October 2021 because CURRY quit paying Company 1. CURRY still owed Company 1 approximately $105,000. In an interview with the FBI on or about January 19, 2022, CURRY stated he owned 880 Red Pond Road Bowling Green, Kentucky. CURRY described the property as a farm with eighty acres and cattle. CURRY further stated he was working on remodeling the farm property into a "barndominium" to live in.

81.     In addition to the aforementioned home construction and home remodeling payments, from March 17, 2020 through May 28, 2021, funds from IOLTA account were wired to

the following: a King Cash Assets[33] account, CATAPULT account x5688 at JPMorgan Chase Bank, and companies identified by investigating agents as realty companies, title companies[34], and rental property companies. On or about February 10, 2021, King Cash Assets received approximately $20,000 from IOLTA account with a wire note stating, "From Catapult Funding". From on or about May 19, 2020 through June 1, 2020, approximately $185,500 was wired from IOLTA account to title companies with wire notes stating, "From Catapult Funding". As detailed in paragraphs 94 through 98, the bank records indicate that M. CARROLL and CURRY are purchasing or renting real property for themselves with victim funds.

82.     A review of records from a title company identified that $146,000 of the $185,500, discussed in paragraph 98, was used to purchase property by TACK INC.[35], a company associated with M. CARROLL. In addition to the purchase of property, M. CARROLL used victim funds to pay rent. Investigators observed checks from the Carroll Foundation account x6722 to what appears to be a property management company. The check memo lines contained "July Rent" and "4057 Whitehead."[36] Based on the financials, investigators believe M. CARROLL paid approximately $44,362 of victim funds to rent a home.

---

[33] King Cash Assets is an LLC that was organized in the State of Missouri on or about December 21, 2018. According to the State of Missouri Articles of Organization records, the purpose for which King Cash Assets LLC was organized was "business" and the only individual identified as being associated with the business was Individual 3.

[34] A title company is a neutral third party hired by the purchaser to research and insure the title of the property being purchased.

[35] TACK INC was registered with the Wyoming SOS on or about November 7, 2019 and listed M. CARROLL as an incorporator.

[36] Investigating agents believe this address to be 4057 Whitewater Dr., Lexington, Kentucky, an address known to be associated with M. CARROLL.

83.     Between May 2020 and March 2021, approximately $1,918,773 was wired from IOLTA account to CATAPULT account x5688. A review of the activity contained in CATAPULT account x5688 revealed transfers to CURRY's and M. CARROLL's personal bank accounts, transfers to entities created by CURRY and M. CARROLL, the purchase of goods and services, and transfers of funds to unknown participants and potential victims. The goods and services include, but are not limited to, purchases at gas stations, fast-food chains, electronic stores, home improvement stores, grocery stores, waste management utility bills, electric utility bills, satellite television bills, health and supplement retail stores, coffee shops, internet entertainment streaming services, medical and dental expenses, clothing stores, and home good stores.

84.     Based on my training and experience, I believe the activity in CATAPULT account x5688 and IOLTA account to have characteristics of a Ponzi scheme. Examples of transactions that appear to have characteristics of a Ponzi scheme would be those between Individual 4 and CURRY. On or about May 10, 2019, CURRY's account x6162 received a $30,000 deposit via check from Individual 4. The memo line of the check said "investment". On or about May 8, 2020, Individual 4 received a wire of $100,000 and an entity under Individual 4's control[37] received a wire of $130,000, both from IOLTA account. On or about June 12, 2020, the entity under Individual 4's control received an additional $25,000 from IOLTA account.

85.     The financial analysis is ongoing, but the investigation has revealed Individual 4 provided a total of $30,000 to CURRY and then approximately one year later, Individual 4 was paid $100,000, a 233% return on investment in one year. If the funds received by the entity under Individual 4's control were to be included in the calculation, the return would total $255,000, or a

---

[37] Kentucky SOS business registration and account holder documents identified Individual 4 was the president and director of the entity.

750% return on investment, in one year. Investigating agents believe the high rate of return on Individual 4's investment likely influenced Individual 4 into providing CURRY with additional funds. On or about April 7, 2021, CATAPULT account x5688 received an additional $100,000 from Individual 4. On or about May 10, 2021, the entity under Individual 4's control received $6,000 from CATAPULT account x5688.

86.     Based on a review of these transactions, specifically the large transfers to Individual 4 following the original smaller transfer to CURRY, investigating agents believe that these transactions have the characteristics of a Ponzi scheme. The resulting larger investment by Individual 4 was likely provided to CATAPULT because the smaller original investment was "proven." By CURRY providing large returns upfront, Individual 4 was most likely convinced that the investment was not a scam, and therefore provided a larger investment under the assumption there was less risk. Additional characteristics of a Ponzi scheme include demonstrating large amounts of wealth to show credibility. This can be achieved through purchasing, renting, or displaying items that are considered of value, such as jewelry, houses, cars, or charitable donations.

87.     Individual 4 is affiliated with School 1. In early 2020, Individual 4 and School 1 were soliciting funds to replace the school's football field's turf. On or about April 13, 2020, a wire transfer of $425,000 was made from IOLTA account to School 1. In October of 2020, a social media post was made by School 1 announcing the football field was renamed the "Curry and Carroll Field." A discussion occurred on School 1's social media post as to why the field was renamed. One of the comments made by an individual stated, "They did a donation for a new turf!!!" This type of public donation is indicative of subjects trying to establish their credibility and demonstrate wealth. Furthermore, this type of activity is used to create advertising and to generate more victims to continue the fraud scheme.

38

88.     From approximately October 2019 to June 2021, the **Subjects**, their family members, and their associated entities received approximately $4,231,405 in transfers from CATAPULT account x5688. CURRY account x3195, received approximately $505,812 from CATAPULT account x5688. DSACI account x3895 and Still Oaks Farm account x9223, both entities created by CURRY, received, in total, approximately $668,657 from CATAPULT account x5688. M. CARROLL received approximately $140,457 from CATAPULT account x5688. From December 2019 through October 2020, bank accounts associated with the Carroll Foundation Inc., an entity created by M. CARROLL, received approximately $1,408,008 from CATAPULT account x5688. From April 2020 through October 2020, B. CARROLL received approximately $23,406 from CATAPULT account x5688. On or about August 13, 2020, WRIGHT received approximately $5,000 from CATAPULT account x5688. Funds from CATAPULT account x5688 were also used to purchase goods and services such as airfare, hotels, tax services, website hosting, food and beverages, credit card payments, and luxury resorts and spas.

89.     A review of records received from JPMorgan Chase Bank identified DSACI account x3895. From December 2019 through October 2020, approximately $371,393 from DSACI account x3895 was spent on goods and services. The following are examples of the spending from DSACI account x3895: approximately $39,499 on rental vehicles, approximately $18,231 on landscaping services, and approximately $37,761 on restaurants and groceries.

90.     In summary, M. CARROLL and CURRY received in bank accounts they controlled, approximately $11,533,316 from an unknown number of entities and individuals. Approximately $7,955,562 was returned to original transferees or participants with unknown involvement in the scheme. M. CARROLL, CURRY and their associated entities retained approximately $3,577,754 of the funds they received over the 11-month period.

91.     Investigators conducted a financial review of currently identified traditional bank accounts and mobile payment accounts associated with the **Subjects** in an effort to identify any transactions with Individual 5. The only transactions identified were two Green Dot payments from Individual 5 to CURRY totaling $1,800. As of the date of this filing, there were no financial transactions identified in which the **Subjects** paid Individual 5 or his/her associated entities. Therefore, investigating agents believe that the **Subjects** did not pay Individual 5 any of their own money to obtain funding.

### Identification of Subject Devices 1

92.     M. CARROLL provided and/or utilized 859-230-6191 for the following:

a.      On or about December 27, 2021, LOCKHART was interviewed by the FBI and stated he communicated with M. CARROLL via 859-230-6191. LOCKHART stated M. CARROLL primarily utilized texting and phone calls and that M. CARROLL did not use email very much.

b.      On or about January 19, 2022, M. CARROLL was interviewed by the FBI and stated his phone number was 859-230-6191 and that he had used that phone number for approximately fifteen years. M. CARROLL stated he used that phone number for both personal and business matters. M. CARROLL stated he primarily communicated with Individual 5 via text, phone, Signal, and previously WhatsApp.

c.      Individual 5 provided 859-230-6191 as M. CARROLL's contact number.

93.     Toll records and subscriber information were received from T-Mobile for 859-230-6191. A review of toll records for 859-230-6191 identified the following approximate numbers of phone contacts[38]:

    a.    CURRY (x7922): 5/15/19 through 6/28/22- approximately 4,152 contacts.

    b.    LOCKHART: 5/15/19 through 9/26/22- approximately 1,808 contacts.

    c.    Company 2: 10/15/19 through 2/17/23- approximately 685 contacts.

    d.    B. CARROLL: 5/20/19 through 3/10/23- approximately 645 contacts.

    e.    WRIGHT: 5/24/19 through 2/7/22- approximately 484 contacts.

    f.    Individual 14[39]: 3/14/20 through 2/1/23- approximately 446 contacts.

    g.    Individual 5: 6/4/20 through 12/27/21- approximately 374 contacts.

    h.    VICTIM 6: 1/13/20-3/26/21- approximately 136 contacts.

    i.    CURRY (x2499): 8/9/21-11/21/22- approximately 75 contacts.

    j.    VICTIM COMPANY 2: 12/26/19-10/13/20- approximately 35 contacts.

    k.    FIORE: 5/16/19-7/8/21- approximately 10 contacts.

    l.    VICTIM 8: 4/14/21-4/24/22- approximately 5 contacts.

    m.    VICTIM 7: 5/27/20-8/10/20- approximately 2 contacts.

    n.    VICTIM COMPANY 1: 12/282020- approximately 1 contact.

---

[38] As detailed in this affidavit, a phone contact consists of a phone call or a text message.

[39] In an interview with the FBI, Victim 12 stated he/she understood Individual 14 to be working as a local representative for Catapult Funding who would get people to sign on for loan deals. Victim 12 further stated that Individual 14 was "very tight" with the **Subjects**. Investigating agents have made numerous attempts to contact and interview Individual 14 without success but believe Individual 14 has recruited victims into the private loan agreements fraud scheme on behalf of the **Subjects.**

94.     According to device information provided by T-Mobile, from approximately August 2019 to present, the 859-230-6191 phone number was associated with an Apple iPhone X, international mobile equipment identity ("IMEI") 35486709593851, the **Subject Phone 1**.

95.     Furthermore, the evidence indicates that in addition to the **Subject Phone 1**, M. CARROLL was also likely using a computer and/or thumb drives to conduct business activities on behalf of CATAPULT.   The Microsoft search warrant returns revealed a series of email messages between WRIGHT and email address ed@stokedintel.com that indicate M. CARROLL used a computer.  In one email dated July 13, 2020, ed@stokedintel.com wrote, in pertinent part, "Leslie, / Thank you for this opportunity. Attached you will find two separate invoices."  The email included two attachments that appear to be invoices from "Stoked Intel."  One invoice is dated July 13, 2020 and is addressed to M. CARROLL.  Among the items listed in the invoice are "C/S Vanilla Secure Phone Hardware/Software", "Encrypted, Portable Bootable TD Windows (Gandalf)", and "E-Sim Travel Router with non-attributable monthly service in 130 countries." The total charge at the bottom of the invoice was $15,762.30. WRIGHT replied to the email on July 13, 2020 and wrote, in pertinent part, "Mark will just have Anthony come up one day and setup his desktop. / There will most likely be conversations later for adding more phones and more thumb drives."

### Identification of Subject Devices 2

96.     CURRY provided and/or utilized 270-709-7922 for the following:

a.      On or about December 27, 2021, LOCKHART was interviewed by the FBI and stated CURRY's phone number was 270-709-7922.

b.      On or about January 19, 2022, CURRY was interviewed by the FBI and stated 270-709-7922 was his cell phone number. CURRY provided the interviewing agent with

numerous email accounts he used for business and personal use. CURRY stated all of his email accounts were in the same inbox on his cell phone. Furthermore, CURRY stated he communicated with Individual 5 via phone calls and text messages.

        c.        Individual 5 provided 270-709-7922 as CURRY's contact number.

97.        Toll records and subscriber information were received from Verizon for 270-709-7922. A review of toll records for 270-709-7922 identified the following:

        a.        M. CARROLL: 10/2/17-6/28/22- approximately 4201 contacts.

        b.        Company 1: 4/29/18-1/18/22- approximately 1,804 contacts.

        c.        Individual 3: 11/15/17 through 1/20/23- approximately 1518 contacts.

        d.        WRIGHT: 3/28/19-10/1/22- approximately 776 contacts.

        e.        Individual 7: 10/11/17-5/6/22- approximately 412 contacts.

        f.        VICTIM 7: 4/16/20-1/15/22- approximately 260 contacts.

        g.        Individual 5: 4/14/20-12/14/21- approximately 217 contacts.

        h.        CURRY (x2499): 8/9/21-12/7/22- approximately 22 contacts.

        i.        LOCKHART: 10/13/17-5/6/22- approximately 6 contacts.

        j.        VICTIM COMPANY 1: 7/22/20-12/22/20- approximately 3 contacts.

        k.        B. CARROLL: 7/29/20-12/3/20- approximately 2 contacts.

        l.        FIORE: 8/9/21- approximately 1 contact.

        m.        VICTIM COMPANY 4: 3/2/21- approximately 1 contact.

98.        CURRY provided and/or utilized 270-791-2499 for the following:

        a.        On or about July 11, 2022, CURRY created a Coinbase account and linked 270-791-2499 to the account.

99.     Toll records and subscriber information were received from AT&T for 270-791-2499. A review of toll records for 270-791-2499 identified the following:

a.      M. CARROLL (x6191): 08/10/21-11/21/22- approximately 86 contacts

b.      Individual 7[40]: 02/05/2022-09/21/22- approximately 43 contacts

c.      Individual 6: 02/02/22-10/03/22- approximately 40 contacts

d.      CURRY (x7922): 10/08/21-12/30/22- approximately 29 contacts

e.      WRIGHT: 8/24/21-10/03/21- approximately 29 contacts

f.      Individual 3: 1/24/2022-12/16/22- approximately 23 contacts

g.      Company 1: 01/24/22-02/10/22- approximately 20 contacts

100.     According to device information provided by Verizon, from approximately November 2019 to March 2023, the 270-709-7922 phone number was associated with an Apple iPhone 11 Pro Max, IMEI 35389210281236. According to device information provided by AT&T, from approximately August 2021 to April 2023, the 270-791-2499 phone number was associated with an Apple iPhone 11, IMEI 35290111591302. Together, these devices are collectively referred to as the **Subject Phones 2**.

---

[40] Investigating agents interviewed representatives of an additional victim company ("Victim Company 9") who reported they fell victim to a possible third scheme perpetuated by CATAPULT FUNDING. On or about April 23, 2020 and May 22, 2020, Victim Company 9 signed two promissory notes with CATAPULT. CURRY told Victim Company 9 their money would be held in Individual 2's bank account in order to free up some of CATAPULT's money to invest in a PPE deal. CURRY told Victim Company 9 the alleged PPE deal was to purchase PPE from overseas and then resell the PPE in the United States for two to three times the purchase cost. CURRY told Victim Company 9 that three months after their investment date, they would get their money back plus 100% interest. Victim Company 9 wired $500,000 and $1,000,000 on or about April 24, 2020 and May 22, 2020, respectively, to IOLTA account. To date, Victim Company 9 received one payment of $35,000 directly from CATAPULT. Additionally, Victim Company 9 retained a lawyer and filed a civil lawsuit against CURRY, M. CARROLL and CATAPULT. As a result of the civil lawsuit and liens placed on properties owned by CURRY and M. CARROLL, Victim Company 9 was able to recover additional funds totaling just over $1 million. Individual 7 is associated with Victim Company 9 and was how CURRY was able to introduce this deal.

101.    Furthermore, the evidence indicates that in addition to the **Subject Phones 2**, CURRY was also likely using a laptop and/or thumb drives to conduct business activities on behalf of CATAPULT.   The Microsoft search warrant returns revealed a series of email messages between WRIGHT and email address ed@stokedintel.com that indicate CURRY used a laptop.   In one email dated July 13, 2020, ed@stokedintel.com wrote, in pertinent part, "Leslie, / Thank you for this opportunity. Attached you will find two separate invoices."   The email included two attachments that appear to be invoices from "Stoked Intel."  One invoice is dated July 13, 2020 and is addressed to CURRY.  Among the items listed in the invoice are "C/S Vanilla Secure Phone Hardware/Software", "Encrypted, Portable Bootable TD Windows (Gandalf)", and "E-Sim Travel Router with non-attributable monthly service in 130 countries." The total charge at the bottom of the invoice was $15,762.30. WRIGHT replied to the email on July 13, 2020 and wrote, in pertinent part, "Luke most likely will bring a laptop tomorrow that is his wife's. He wants hers to be used for the thumb drive. I have asked him to send me the credentials of the laptop to make tomorrow easier as well (instead of my computer- Unless he gets there and decides to use mine)."

**Identification of Subject Premises 1**

102.    On April 3, 2023, Magistrate Judge Lisa A. Jensen issued a federal search warrant and order in the Northern District of Illinois, Western Division, to allow the government to obtain location data and a pen register trap and trace for a cellular telephone assigned call number 859-230-6191 (**Subject Phone 1**) for a period of forty-five days as well as historical location data from March 14, 2023 through April 3, 2023. A review of the historical location data received identified the most frequently used cell site was consistent with **Subject Phone 1** being located in the vicinity of **Subject Premises 1**. Additional location data was captured for **Subject Phone 1** from April 4, 2023 through the present date. A review of the location data received to date identified the most

frequently used cell site was consistent with the phone being located in the vicinity of **Subject Premises 1**.

103.     On February 27, 2023, M. CARROLL was issued a driver's license with an address of the **Subject Premises 1**. On March 23, 2023, an individual, known to law enforcement as M. CARROLL's wife, registered a 2015 Jeep, bearing vehicle identification number ("VIN") ZACCJABT0FPB74360, at the **Subject Premises 1**. On April 5, 2023, M. CARROLL/Catapult Enterprises, LLC, registered a 2015 Hyundai, bearing VIN 5XYZU3LB6FG258651, at the **Subject Premises 1**.[41]

104.     On April 19, 2023, physical surveillance was conducted of the **Subject Premises** which identified the aforementioned Jeep and Hyundai present in the driveway.

### Identification of Subject Premises 2

105.     On April 3, 2023, Magistrate Judge Lisa A. Jensen issued federal search warrants and orders in the Northern District of Illinois, Western Division, to allow the government to obtain location data and a pen register trap and trace for cellular telephones assigned call numbers 270-791-2499 and 270-709-7922 for a period of forty-five days as well as historical location data from March 14, 2023 through April 3, 2023 and April 4, 2023, respectively.

106.     A review of the historical location data received for 270-709-7922 identified the cell tower with the highest frequency of data points during the overnight hours of midnight to 8:00 a.m., was consistent with the device being at the **Subject Premises 2**. Additional location data was captured for 270-709-7922 from April 17, 2023 through April 24, 2023. A review of the location

---

[41] Based on my training and experience and evidence in this case, I believe this individual to be M. CARROLL's wife because, including but not limited to, review of social media, open source information, and database checks.

data during the overnight hours of midnight to 5:00 a.m. were consistent with the device being located in the vicinity of the **Subject Premises 2**.

107.    A review of the historical location data received for 270-791-2499 identified the most frequently used cell site was consistent with the phone being located in the vicinity of **Subject Premises 2**. Additional location data was captured for 270-791-2499 from April 4, 2023 through the present date. A review of the location data received to date identified the most frequently used cell site was consistent with the phone being located in the vicinity of **Subject Premises 2**.

108.    On November 4, 2022, an individual, known to law enforcement as CURRY's wife, opened a P.O. Box in Bowling Green, Kentucky. The verified address listed on the P.O. Box account opening documents was the **Subject Premises 2**.

109.    On December 21, 2022, CURRY's wife was issued a driver's license with an address of the **Subject Premises 2**.

110.    Physical surveillance was conducted of the **Subject Premises 2** on January 30, 2023 which identified two vehicles in the driveway. One vehicle was a 2019 Nissan Armada that returned a registered owner of CURRY's wife, bearing VIN JN8AY2ND0K9093450. The second vehicle was a 2011 Ford F450 that returned a registered owner of CURRY's wife, bearing VIN 1FT8W4DT7BEC18097.

111.    Physical surveillance was conducted of the **Subject Premises 2** on February 1, 2023 and February 28, 2023 and amongst the vehicles identified were the two aforementioned vehicles registered to CURRY's wife.

112.    Based on my training and experience, I know that individuals travel to and from locations in their vehicles with their cellular devices and other electronics in their vehicles. On January 19, 2022, when M. CARROLL and CURRY traveled to the FBI Lexington office and

voluntarily participated in interviews, they both made statements upon arrival that they had left their cellular devices in the vehicle they arrived in. Based on all the aforementioned information, there is probable cause to believe that evidence, fruits and instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud) are presently located at the **Subject Premises 1** and **Subject Premises 2**, in any vehicles on **Subject Premises 1** and **Subject Premises 2**, on M. CARROLL's or CURRY's person, in the **Subject Devices 1** utilized by M. CARROLL, and/or in the **Subject Devices 2** utilized by CURRY.

113.    In addition, I know that individuals commonly keep their cell phones at their residence or on their person when they leave their residence. As noted above, location information for **Subject Phone 1** and the **Subject Phones 2,** were frequently located near the **Subject Premises 1** and **Subject Premises 2**, respectively.

114.    I also know that individuals commonly have and keep multiple electronic devices at their residences, including old cell phones, computers, and/or tablets, and that evidence of the **Subject Offenses** may be found on multiple electronic devices located at the **Subject Premises 1** and/or **Subject Premises 2**, and not just on the **Subject Phone 1 or the Subject Phones 2.**

### Ongoing Investigation

115.    On March 24, 2023, Victim 12[42] was interviewed by the FBI. Victim 12 provided the FBI with screen shots of a Facebook Messenger conversation that occurred on March 11, 2023

---

[42] Victim 12, who is not further detailed in this affidavit, provided information that they loaned $300,000 and then $56,000 to Individual 14, who worked at CATAPULT FUNDING or Freedom Consulting, for a business opportunity. Individual 14 told Victim 12 their money would never leave the trust account, was secure and would be pooled with other clients' money for private equity deals. A review of financial records identified Victim 12's two payments being deposited into CATAPULT account x5688. Victim 12 received two payments of $40,000 each from Freedom Consulting as pay outs for the loans. As of the date of this filing, Victim 12 has not received any additional money back from CATAPULT FUNDING.

with Individual 14. In summary, in the Facebook Messenger conversation, Individual 14 stated he/she had seen some documents that "they" are to be paid, the first payment was supposed to come Friday, and "they" expect everything to be paid out in the next ten days. Based on the context of the conversation and my knowledge of this investigation, I believe the "they" that Individual 14 references refers to the **Subjects**.

116.    On March 25, 2023, Victim 12 received another Facebook Messenger communication from Individual 14 that stated he/she had just received, "I'll have you dates first of the week (Monday Tuesday). Plan on being here to sign paperwork end of the week. I'll also send you paperwork for your people to sign. Finally be done with this shit bro." Victim 12 asked Individual 14 who sent him/her that message. Individual 14 replied, "That was from Mark but came from higher ups." Based on my knowledge of this investigation, I believe the "Mark" Individual 14 refers to is M. CARROLL. Investigating agents believe the **Subjects** are continuing to perpetuate the above detailed fraud schemes and the criminal activity is ongoing.

117.    In my training and experience, individuals perpetuating fraud schemes, such as those detailed in this affidavit, may maintain physical records that contain evidence related to the scheme. Such evidence may be found in paperwork, notes, journals or other physical formats stored within a residence or vehicle. This evidence may provide additional information related to the fraud scheme.

118.    In my training and experience, electronic devices such as cellular phones, tablets, computers, and electronic storage devices can contain evidence related to investment fraud. Such evidence may be found in the text messages, emails, documents, and other records stored in an electronic device.  This evidence may establish the "who, what, why, when, where, and how" of

the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

119.    The stored communications and files connected to the electronic device may provide direct evidence of the offenses under investigation.  For example, text messages and emails contained on a cellular phone exchanged between M. CARROLL or CURRY and a victim company. Based on my training and experience, instant messages, emails, voicemails, photos, videos, financial data, financial communications and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. For example, photos and videos relevant to the scheme may be contained on M. CARROLL or CURRY's cellular phones; such as when traveling via private jets or the purchase/remodeling of private residences, which victims' funds were traced to or even taking pictures of themselves with victims and others involved in the financial fraud scheme.

120.    The web browsing history and associated metadata contained in the electronic devices may provide direct evidence of the **Subject Offenses**. For example, WRIGHT sent an email to B. CARROLL on or about May 11, 2021 instructing B. CARROLL to create a website for one of CATAPULT's associated entities, Aeterna.  The email read, in part, "The Aeterna Site just needs to be a general summary of us.  Doesn't need to mention gold, diamonds, etc.  This is strictly our 'landing site' to have a presence online.  […] Think wealth solutions and very general and vague." Furthermore, web browsing history and associated metadata could reveal searches by the **Subjects** related to perpetrating financial fraud schemes, such as a Ponzi scheme, and the means and methods to do so and how to cover up such schemes. Finally, web browsing history and associated metadata could also reveal the **Subjects**' research on victims, prospective victims, and other individuals related to their financial fraud scheme.

50

121.    In addition, the electronic device contains activity logs, stored electronic communications, and other data retained by the device that indicates who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date, and time) may be evidence of who used or controlled a cellular phone at a relevant time.  As an example, because every mobile device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigating agents to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

122.    Based on my training and experience, I believe that location information related to the **Subjects** will constitute and lead to evidence of the **Subject Offenses** by, including but not limited to, the following: (1) providing additional evidence of the identities of the users of **Subject Phone 1** and **Subject Phones 2,** users who are believed by investigating agents to be the **Subjects,** as well as evidence of the users of other electronic devices, such as **Subject Devices 1** and **Subject Devices 2**; (2) assisting investigating agents in identifying/locating individuals and/or victims associated with the **Subjects**; (3) confirming any meetings the **Subjects** may have had with others, including any meetings with victims;   (4) assisting investigating agents in determining the locations at which the **Subjects** have banked/are banking and/or have conducted/are conducting financial transactions; (5) assisting investigating agents in identifying assets formerly or currently held by the **Subjects**; (6) assisting investigating agents in determining/confirming locations at

which the **Subjects** have lived, live, and/or frequenting; (7) assisting investigating agents in determining the **Subjects'** locations at the time of making/sending and receiving telephone calls and text messages, and thereby likely evidence of the use of wires and potentially interstate wires.

123.    Account activity may also provide relevant insight into the electronic device owner's state of mind as it relates to the offenses under investigation.  For example, information on the user account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

124.    Other information contained on the **Subject Devices** may lead to the discovery of additional evidence.  For example, the identification of apps downloaded to a cellular phone from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition to communication application data from banking, trading and brokerage applications may reveal evidence of a crime. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

125.    Therefore, the **Subject Devices** are likely to contain stored electronic communications and information concerning the **Subject Offenses**.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify additional subjects, co-conspirators, and or victims.

126.    Based on the above information, I respectfully submit that there is probable cause to believe that the **Subject Offenses** have been committed and are being committed and/or will be committed by the **Subjects**, that evidence, fruits and instrumentalities relating to this criminal

conduct, as further described in Attachments B1 and B2, will be found at the **Subject Premises 1** and **Subject Premises 2** and on the **Subject Devices 1** and **Subject Devices 2**, as further described in Attachment A1 and A2.  I therefore respectfully request search warrants be issued for the **Subject Premises 1** and **Subject Premises 2** and **Subject Devices 1** and **Subject Devices 2**, more particularly described in Attachment A1 and A2, authorizing the seizure of the items described in Attachment B1 and B2.

### Biometric Access to Devices

127.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

128.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

129.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain

53

Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

130.    If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

131.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

132.    As discussed in this Affidavit, I have reason to believe that one or more electronic devices will be found during the search.  The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement.  Thus, law

enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

133.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

134.    Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request authority for law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of M. CARROLL or CURRY to the fingerprint scanner of the devices found at the **Subject Premises 1** or **Subject Premises 2**, in vehicles on **Subject Premises 1** or **Subject Premises 2**, or on M. CARROLL's or CURRY's person; (2) hold the devices found in front of M. CARROLL's or CURRY's face to activate the facial recognition feature; and/or (3) hold the devices found in front of M. CARROLL's or CURRY's face and activate the iris

55

recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

FURTHER AFFIANT SAYETH NOT.

/s/ Kyla Taylor
Kyla Taylor
Special Agent
FBI

Attested to by applicant per FRCrP 4.1 by reliable electronic means on this 8th day of May, 2023.

Honorable Matthew A. Stinnett
United States Magistrate Judge